UNITED STATES v. The ACORN. See Case No. 29.

## Case No. 14,420.

### UNITED STATES v. The ACTIVE.

[5 Hall. Law J. 543; 2 Car. Law Repos. 192; 3 Wheeler. Cr. Cas. 264.]

District Court, Territory of Mississippi. Dec., 1814.

INTERNATIONAL LAW — APPLICATION TO PRIZE CASES — RIGHTS OF CAPTORS — VESSEL CAPTURED BY LAND FORCES.

[1. International law is limited to questions affecting the mutual relations of nations. Therefore. in its application to prize cases, it only determines under what circumstances prizes may be taken, and does not attempt to declare to whom the property shall go after it is taken,—whether to the captors themselves, or to their government. These latter questions must be regulated exclusively by the municipal law of the captors' own country.]

[2. Soldiers belonging to the land forces of the United States have not, in the absence of statute, any right of property in a vessel captured by them on the sea; and no such right has been given to them by any act of congress. Such a

right has not to be inferred from the provisions of the fifty-eighth article of the rules and articles of war in respect to property captured in camps, etc., and the act of April 23, 1800 (2 Stat. 45), for the better government of the navy, etc., as well as the act of June 26, 1812 (2 Stat. 759), concerning letters of marque, prizes, and prize goods, has no application to captures made by land forces.]

[This was a libel filed in the name of the United States against the schooner Active and cargo to procure their condemnation as prize of war.]

TOULMAN, J. This is the case of a vessel and cargo belonging to the enemy taken in sight of the fort at Mobile Point, by the troops stationed at that place under the command of Major Wm. Lawrence. It appears from the testimony of two of the persons who boarded the vessel, that a boat with six men was sent out by the commanding officer to examine a vessel which, on approaching. they found to be British; that after being fired upon by the fort, she was boarded and taken without opposition, at the distance of about a mile, or perhaps more, as one of them says, or about two miles, as the other thinks; that she was under British colors; that the persons on board acknowledged themselves to be British subjects, and said they were detached from the Sea Horse to bring the schooner Active and cargo (consisting of flour captured at Alexandria) to Pensacola; and that the crew, consisting of six men, were armed with muskets, cutlasses and pistols. The log book shows her to be British. The libel prays the condemnation of the vessel and cargo as good and lawful prize to the United States. A plea, however, is filed by Lewis Judson, (in the character of consignee and agent for the captors,) to the jurisdiction of the court, on the ground that as this court has jurisdiction only in cases in which the United States are parties. it cannot legally entertain a suit in which the private captors (as it is alleged) are the only parties who have a right to claim the captured property. The said plea farther alleges that the "schooner Active and cargo were captured by Wm. Lawrence and others on the high seas. and not in the enemy's forts, camps. or barracks, and, therefore, by the usages of the laws of nations and the laws of war, as enemy's property, become forfeited to the said private captors."

No question has been made as to the regularity (see Teasdale v. The Rambler [Case No. 13,815]) of the plea, nor as to the legitimacy of the conclusion. that the government is in no sense to be regarded as a party, if the proceeds of a capture are suffered to go to the troops engaged in making the capture; but the whole has been liberally left by the attorney (Mr. Haines) prosecuting on behalf of the United States, to depend on the simple question whether the troops of the United States thus making a prize are entitled by law to the benefit of it? The general belief that they are so entitled, the want

of a knowledge of correspondent cases, and the little attention which, in this part of the country, we have had occasion to give to inquiries of this nature, have apparently created doubts even in the mind of the attorney acting for the United States, and have rendered both parties desirous that the question should be judicially settled. The most satisfactory mode probably of coming to a conclusion on this subject will be to have recourse to general principles.

"1. What is war? It is a contest," says Bynkershoek, "carried on between independent persons for the sake of asserting their rights." Where society does not exist,—where there is no such institution as that which we call government,—there individuals, being strictly independent persons, may carry on war against each other. But whenever men are formed into a social body, war cannot exist between individuals. The use of force among them is not war, but a trespass, cognizable by the municipal law. Bynk. War, p. 128. If war, then, be the act of the nation, whatever is done in the prosecution of it, must either expressly or implicitly be under the national authority. Whatever private benefits result from it must be from a national grant. "War," says Vattel (page 368), "is that state in which a nation prosecutes its right by force." The right of making war belongs alone to the sovereign power. Individuals cannot control the operations of war, nor commit any hostility, (except in self defence,) without the sovereign's order. The generals, (adds that writer,) the officers, the soldiers, the partizans, and those who fit out private ships of war, having all commissions from the sovereign, make war by virtue of a particular order. And the necessity of a particular order is so thoroughly established, that even after a declaration of war between two nations, if the peasants themselves commit any hostilities, the enemy, instead of sparing them, hangs them up as so many robbers or banditti. This is the case with private ships of war. It is only in virtue of a commission granted by the sovereign or his admiralty, that they are entitled to be treated like prisoners taken in a formal war. Vatt. Law Nat. pp. 365, 366. If, then, on the general principles of civil society, the whole operations of war, depend upon the will and authority of the government, surely the appropriation and distribution of the property acquired in consequence of those operations must equally be subject to the control of the government, and depend on those regulations which it may establish.

2. What indeed is the object of war? Is it to aggrandize individuals, or is it to maintain the rights of the nation? "The just and lawful scope of every war," observes Vattel (page 280), "is to revenge or prevent injury. If, to accomplish this object, it be expedient to encourage individual warfare, by granting all the profits arising from it to the parties engaged, the nation has a right to promise this encouragement; but until this encouragement be actually offered, it must follow that every thing which is required by individuals, whether acting as private persons or as a part of the public force, must belong to the nation under whose authority they act."

3. What rights are acquired by a state of war? "A nation," says Bynkershoek (page 4), "who has injured another is considered, with every thing that belongs to it, as being confiscated to the nation which receives the injury." The rights accruing, therefore, are national altogether. They are not individual rights. The case seems analogous to that of the internal administration of justice. A civil society—a nation—has the right of punishing those who are guilty of violating the public laws. Though the guilty be members of their own community, they may forfeit their property or their lives. But the right of the body politic does not attach itself to the individual members of it. The nation, indeed, might authorize individuals to take the lives or the property of known offenders; but, without an authority delegated by the nation, individuals have no such right. A right in private persons to avenge violations of the law does not follow as a natural consequence from the circumstance of their being members of the great political body. On the contrary, the very same act which would be retributive justice when emanating from the sovereign power would become murder or robbery in the individual. Why should it be otherwise, as it regards our intercourse with other nations? Why should a nation be less jealous of its rights with regard to hostile nations than with regard to hostile individuals? Why less jealous when they are encroached upon on a large scale than when they are encroached upon on a scale truly small and insignificant? And even admitting that in the one case the public authority permits an individual to execute the sentence of the law, and in the other to attack and vanquish the public enemy, it will not follow that in either case the property of the enemy is to become the property of the individual by whom the national will is carried into execution. This, it should seem, must depend on express stipulations made in behalf of the nation. Agreeably to these principles, the celebrated M. De Vattel, after observing that a nation has a right to deprive the enemy of his possessions and goods, of every thing which may augment his forces and enable him to make war, goes on to remark, that booty, or the moveable property of the enemy taken in war, belongs to the sovereign making war, no less than his towns and lands: for he alone (the sovereign authority) has such claims against the enemy as warrant him to seize on his goods, and appropriate them to himself. His soldiers (he adds) are only instruments in his hand, for asserting his right. He maintains and forms them. Whatever they do is in his name and

for him. Vatt. Law Nat. 335. These principles are equally applicable to every form of government. It is perfectly immaterial with whom the sovereign authority resides. With whomsoever it resides, its power is erected on the doctrine of its being the legitimate representative of the nation; and the rights of the nation are not surely to be considered as being less, under a republican, than under a monarchical, form of government.

The nation, however, as I have observed before, may give a bounty to individual captors—may relinquish a part of its rights to those who fight under its banners. Agreeably to this the same writer goes on to observe that "the sovereign may grant to the troops what share of the booty he pleases. At present most nations allow whatever they can make on certain occasions, when the general allows of plundering what they find on enemies fallen in battle; the pillage of a camp when it has been forced and sometimes that of a town taken by assault." The cases here enumerated seem to be those where either the object was too trifling to become a matter of national attention, or where the services previously rendered by the troops called for a degree of vigour and exertion which would merit extraordinary encouragement. The whole, however, is made to depend on the will of the nation, expressed through their commanding general. The soldier (he adds) in several services has also the property of what he can take from the enemy's troops, when he is on a party, or in a detachment, excepting artillery, military stores, magazines, and convoys of provisions or forage, which are applied to the wants and use of the army. He then goes on to observe, that, when even this custom is introduced into an army, the same right should be allowed to auxiliaries as to the national troops, but proceeds to inform us, that among the Romans, the whole booty was carried to the public stock, and sold under the direction of the general, who then gave a part of the proceeds to the soldiers, and remitted the rest to the public treasury. Vatt. Law Nat. 335, 336. It is evident from the whole strain of this passage, that the author is not attempting to lay down general principles by which nations are to be governed in the disposition of property taken from an enemy; but is merely describing the practice of different nations. In several services, says he, that is in the service of several governments, the soldier has, on certain occasions, the property he takes from the enemy; but it was otherwise, he adds, among the Romans.

I have been more particular in stating the principles laid down by writers on the law of nations, (or the dictates of justice and common sense, as applied to national intercourse,) because the attorney for the claimant, whilst acknowledging that the laws of the United States are silent on the present case, places a great reliance on the injunctions of national law. It is contended that the law of nations gives the booty in this case to the captors, and the principal authority appealed to, is that passage in Vattel which I have just quoted, where, as I conceive, he is simply narrating the usages of some governments, and not laying down principles which are binding upon all.

What, indeed, is the law of nations? It is that rule of conduct which regulates the intercourse of nations with one another; or in the words of the author last cited, "the law of nations is the science of the law subsisting between nations or states, and of the obligations that flow from it." Vatt. Law Nat. 49. It is a law for the government of national communities as to their mutual relations, and not for the government of individuals of those communities in their relation towards one another—nor can it control the conduct of nations towards their own citizens, except in cases involving the rights of other nations. Property once transferred by capture must be subject to the laws of the nation by which the capture is made. The question whether it shall be public or private property must depend on the regulations adopted by the nation making the capture, and cannot naturally be regarded as subject to the control of a system of laws which has respect to the laws and duties of nations towards one another. What our author states as to the practice of nations towards their own citizens, is not, truly speaking, a delineation of the laws of nations. The conduct of nations towards their own citizens, must depend on their own municipal regulations. It is by the laws of nations that we must determine the circumstances under which prizes may be taken, but what is to become of them when taken under the sanction of that law cannot depend upon the law of nations, but must depend upon the will of the nation by which the capture is made. Individuals of the capturing nation can have no right independent of the nation to which they belong. It is by a reliance on the authority of their nation, that they shelter themselves from the charge of robbery or piracy. The sovereign, however, may distribute the booty as he pleases. He may do it by a general law, or by special regulations, issued by his generals, subject to the emergency of the case; provided the form of government admits of such a delegation of authority. Even the property acquired by privateers depends on stipulations made with the supreme power of the country to which they belong. "Persons," says Vattel (page 367), "fitting out ships to cruize on the enemy, in recompense of their disbursements and the risk they run, acquire the property of the capture; but they acquire it by grants of the sovereign who issues out commissions to them. The sovereign either gives up to them the whole capture or a part—this depends on the contract between them." Vatt. Law Nat. p.

367. As to those who without any authority from their sovereign, commit depredations by sea or land, they are regarded as pirates and plunderers, and things taken by them do not thereby undergo a change of property, Bynk. p. 127. The discussion therefore entered into by Bynkershoek in his 20th chapter, respecting captures made by vessels not commissioned, for the purpose of determining whether they should belong to the owner of the ship, the mariners, or the shipper, (and on which a good deal of stress has been laid in argument,) has really but little or nothing to do with the present case. That writer, having previously laid down the established doctrine about robbery and piracy, proposes in his 20th chapter to examine to whom a prize would belong which was taken by a non-commissioned vessel, attacked by the enemy, and in her own defence, seeing the enemy's vessel making the attack. He seems to take it for granted, that the government would put in no claim under such circumstances; and under this supposition, is merely canvassing the respective claims of the sailors, the shipper, and the owner. He afterwards states an objection which may be raised against him in the following words: "It will be said, perhaps, that I am wasting words on an idle and useless question, as it is unlawful to make captures without a commission from the states-general, or the admiral; and so far from the one who takes a prize without such a commission being entitled to it, he is rather to be considered as a pirate, agreeably to the principles which I have above contended for." Page 161. He then quotes Grotius, to show that a prize taken under circumstances of necessity belongs to those who take it.

The doctrine, therefore, which he contends for, has relation simply to the case of mercantile vessel, which being attacked at sea by the enemy, successfully resists the attack and makes a prize of the adverse party. It has clearly no relation to the case now before the court. His reasonings have in general a reference to the laws of the states-general of the United Provinces; and the learned translator in a note upon this chapter seems to state the discussion of the author as founded on the supposition merely, that any persons, other than the sovereign of the captor, may be considered as entitled to the prize. Page 156. Again, in a note at the end of the chapter, he observes: "In France and Great Britain, prizes taken by non-commissioned vessels belong to the lord high admiral, as a droit of his office. No distinction is made whether the captor did, or did not make the capture in his own defence, or from some other justifiable motive. But as in Great Britain the office of high admiral is vested in the king, and has for a long time been executed by commission, suitable rewards are given, at the discretion of the government, in meritorious cases." Page 162.

The English law on this subject seems to be pretty clearly laid down in the course of argument on the case of Lord Camden v. Home, and I do not observe anything in the decision of the court to impeach its accuracy. "Whatever is taken by any of the king's subjects from an enemy in the course of naval operations appertains to the king, either as a jure coronae, or as a droit of admiralty, according to the circumstances. If taken by a private ship, without any commission from the king, the prize belongs to him as a droit of admiralty. If such a ship had a commission, only one tenth of the prize belongs to the king, as a droit of admiralty, and the rest is the property of the owner of the privateer. But where the capture is made by the king's ships or forces, the property is vested in the king's jure coronae; and in such cases it is adjudged by the admiralty lawful prize to the king. But that adjudication by no means imports the capture to have been made by the king's ships exclusively; for, if it were made by his forces, the adjudication would be the same. Now, there are three sorts of joint captures: One by the king's ship and privateer, with letters of marque, the distribution whereof is made, according to the number of persons on board the several ships; the king's share being adjudged to him in the jure coronae. The second instance is of a capture by the king's ship and a non-commissioned privateer. There the king is entitled to the whole. To the privateer's part thereof, it is a droit of admiralty, and the other in jure coronae according to the same mode of distribution. The third is the instance in question, of a capture by the king's army and navy conjointly; and there the whole rests in him jure coronae." 4 Term R. 387.

Agreeably to this statement, we find that Sir William Scott granted a monition against the master and owner of a privateer not commissioned against the Dutch, to bring in the proceeds of a Dutch prize. The party appearing acknowledged that he had no commission, but prayed to be admitted as a joint captor. The court did not even suffer the case to be argued, but observed: "The person admits that he had no commission. It is therefore impossible for him to contend for a legal interest in joint capture. If he thinks he has any equitable claims, arising from any services he has performed, they may be represented to the admiralty. The former proceedings (of condemnation at Jamaica) on the part of the non-commissioned captor are mere nullities; and the property must be proceeded against as droits of admiralty." 4 C. Rob. Adm. 72. The case of The Rebeckah, which was a question of interest in the capture of a vessel made by naval officers from the island of St. Marcou, a naval station, used for the temporary accommodation of the crews of ships of war, gave occasion to remarks from Sir William

.Scott, very applicable to the case now before me. "I accede," says he "entirely to what has been laid down, that a capture at sea, made by a force upon land, (which is a case certainly possible, though not frequent,) is considered generally as a non-commissioned capture, and inures to the benefit of the lord high admiral. Thus, if a ship of the enemy was compelled to strike by a firing from the castle of Dover, or other garrisoned fortress upon the land, that ship would be a droit of admiralty, and the garrison must be content to take a reward from the bounty of the admiralty, and not a prize interest, under the king's proclamation. All title to sea-prize must be derived from commissions under the admiralty, which is the great fountain of maritime authority; and a military force upon the land is not invested with any commission so derived, impressing upon them a maritime character, and authorizing them to take, upon that element, for their own benefit. I likewise think cases may occur in which naval persons, having a real authority to take upon the sea for their own advantage, might yet entitle the admiralty, and not themselves, by a capture made upon the sea, by the use of a force stationed upon the land. Suppose the crew, or part of the crew, of a man of war were landed, and described a ship of the enemy at sea. and that they took possession of any battery or fort upon the shore. and, by means thereof, compelled such ship to strike. I have no doubt that such a capture, though made by persons having naval commissions, yet being made by means of a force upon the land. which they employed accidentally, and without any right under their commission, would be a droit of admiralty, and nothing more." C. Rob. Adm. 227.

Another case in which the right of a party not commissioned for the purpose, to share in a prize, came into view, was that of The Providence, a commissioned vessel, and The Spitfire, a vessel not commissioned, against the Dutch, and who jointly took a Dutch ship. The judge of the high court of admiralty gave to the Spitfire half the share she would have been entitled to, if she had been commissioned; but the lords of appeal pronounced the whole share of the Spitfire liable to confiscation, as a droit or perquisite of admiralty. And yet, in this case, the Spitfire had not only applied for letters of marque. but had obtained a warrant for them to the judge of the admiralty, who, on account of the pressure of business. did not issue them till the day after the capture. 2 Rob. 235, note. An English act of parliament provides, "that in all conjunct expeditions of the navy and army against any fortress upon the land, directed by instructions from his majesty, the flag and general officers and commanders, and other officers. seamen, marines and soldiers, shall have such proportionate interest and property, as his majesty, under his sign manual. shall think fit to order and direct." 2 Rob. 237. The prize act of 21 Geo. III. gives to the officers, seamen, and soldiers, &c., on board every ship and vessel of war in the king's pay, the sole interest in prizes taken by them. 4 Term. R. 391. It should seem as if their courts adhered pretty strictly to the words of their laws in adjudging to whom captured property belongs, and took care to give it to the crown, where there is any doubt about the right of individuals. Thus, in the case of ships taken at Genoa, which were given up on payment of £17,000 by the owners, Sir William Scott said: "I am not aware that the prize act authorizes me to condemn to the captors, in such a case as the present. The act gives them ships, goods, &c., afloat. This is a sum of money, which is not exactly of that description of things." On this account, and another which he mentions, he made the condemnation pass to the crown. 4 C. Rob. Adm. 262.

In the course of argument in the case before me, the counsel for the military force at Mobile Point laid some stress on the observations of Sir William Scott in the case of The Dordrecht [2 C. Rob. Adm. 55] which was a case of joint capture between the army and navy, and where the judge seemed to admit that there might be grounds for making the condemnation partly to the benefit of the army, although the cases did not come within the provisions of the act of parliament, which directed the army to share, in some case, in conjunction with the fleet. It has from hence been concluded that a condemnation might have been made to the army under the law of nations. It is possible, however, that there are other British statutes, besides the 33 Geo. III. (the statute there referred to), under which the army preferred its claim. It may have been built on some royal proclamation; but that it could not have been founded on the law of nations, or on any general principles growing out of a system of national law, must surely be sufficiently apparent from the observations and authorities which have already been brought into view. But the main stress seems to be laid on the consideration that the duty of the army is to fight on the land; that our troops are employed for that especial purpose; that land forces are not required to fit out boats and go to sea; and that fortune having thrown this prize in their way, it ought, on the principles of national law, to be condemned to their benefit. The view, however, which has been already taken of the law of nations, and the objects to which it can apply, seems to take off the weight of this argument. And how much soever one may regret that the gratification is not within the reach of this court to be the medium of awarding a prize to the gallant defenders of Fort Bowyer, it is its duty not to interfere with the prerogatives of the legislative or executive branches of the government; and it must not be disguised, that if the troops at the fort were not, as it seems

to be alleged, under any obligation of noticing the approach of an enemy, unless it were made on terra firma; if everything done to obstruct or capture the enemy on the sea, were merely gratuitous, and beyond the line of their duty, (a doctrine which those gallant men themselves most certainly never would advance,) then their conduct in so transgressing their line of duty would rather stand in need of apology than of reward. "Soldiers," says Vattel (page 367), "can undertake nothing without order either express or tacit, of their officers. Obedience and execution are their province. They are not to act from their own opinions. They are only instruments in the hands of their commanders. Let it be remembered here, that by a tacit order, I mean the substance of what is included in an express order, or in the functions committed to us by a superior; and what is said of soldiers must also be understood of officers, and of all who have any subaltern command. Thus, with respect to things the care of which is not committed to them; they may both be compared to mere private persons, who are to undertake nothing without order. The obligation of the military is still more strict, as the laws of war forbid expressly acting without order; and this discipline is so necessary that it scarcely leaves anything to presumption. To fight without command, is almost always considered in a soldier as fighting against commands, or against the prohibition." For my own part, I do not believe that our valiant soldiers, who but a short time before so much distinguished themselves at Fort Bowyer, would be considered with regard to this vessel as fighting without command. A fort so situated, on a narrow, barren point of land, unconnected with any settlement of moment, but commanding the entrance by water into an extensive and valuable country, must, from the very nature of it, be considered as intended to prevent the ingress of enemy's vessels: and it became the duty of the garrison stationed there, to guard the pass, and to lay hold of everything belonging to the enemy, whether the object could be accomplished by means of the guns at the fort, or by means of boats or other vessels attached to it.

The only question, then, which remains to be considered, is, have the laws of the United States given to the military any share in prizes taken by troops so circumstanced? It may be desirable that they had done so. But this ground seems to be abandoned by the counsel for the army. A kind of negative argument has indeed been raised on the 58th article of the rules and articles of war. It is said that this article confirms to the United States property taken in camps, &c., but not at sea. The words of the article in question are, that "all public stores taken in the enemy's camp, towns, forts, or magazines, whether of artillery, clothing, forage, or provisions, shall be secured for the service of the United States; for the neglect of which the commanding officer is to be accountable." Hence it is concluded, that if they be not public stores, or be not taken in the enemy's camp, towns, forts, or magazines, they are not to be appropriated to the government, but belong to the captors. The object of this article is clearly not to ascertain anything about the right of property, but merely to provide for the safe keeping of public stores belonging to the enemy, and to render the commanding officer responsible for any neglect respecting them. Had a prosecution been commenced against the officer commanding at Fort Bowyer, for any inattention to the preservation of the cargo of the schooner Active, this 58th article, possibly, (inasmuch as the property in question was not taken in the enemy's camp, towns, forts, or magazines,) might not have afforded a legal basis for the prosecution; but no fair deduction from it certainly can ever be carried as far as to show, that because the property captured was not expressly required by this article to be secured for the United States, therefore it must be regarded as the private property of the captor. Whether it be so or not, must depend on established principles, and not on so very strained an implication, and these have already been sufficiently examined.

As to the laws of the United States respecting property captured by the public force, the most material is the act of the 23d April, 1800, for the better government of the navy. This act gives to the captors the proceeds of vessels and goods taken on board of them when adjudged good prize. But this act is a law expressly for the government of the navy of the United States; and, indeed, it does not appear to be contended, that it can by any rule of construction, be extended to the army. Private commissioned vessels, in like manner, deserve their right to appropriate to themselves the prizes they make, from the "act concerning letters of marque, prizes, and prize goods," passed on the 26th day of June, 1812. This act, after stating the conditions on which authority should be given to our vessels to capture the vessels and property of the enemy, proceeds to vest the same, when taken under such authority, in the owners, officers, and crews of the vessels by which prizes should be made. 11 Laws [Weightman's Ed.] p. 240 [2 Stat. 759]. Had it been the intention of the government that non-commissioned vessels should be entitled to the proceeds of prizes made, or that any persons in the employ of the United States, and not belonging to the navy or marines, should be entitled to the benefit of all enemy's property taken by them, it would surely have been natural that such intention should have been expressed in these or some other legislative acts. Moreover, indeed, it does not appear what occasion there could be to provide regulations and bonds for the government and good conduct of vessels applying for commissions to make prizes; if all ves-

sels of any description were authorized to take and to appropriate to their own use the property of the enemy, merely because, as it hath been contended, the fortune of war had thrown it in their way.

It has been stated that a case occurred in New England, soon after the war commenced, where a vessel, which had approached near to a fort of the United States, was condemned for the benefit of the troops by whom it was captured; and it is likewise urged that libels have been filed in behalf of military captors in the federal court of the state of Louisiana. As to the former case, it is only stated on a recollection, which I cannot help believing to be in this instance somewhat inaccurate; and as to the latter, how much soever it may afford a precedent sufficient to justify a practitioner at the bar in putting in a claim, it can afford no precedent to justify a court in sustaining it. In the whole view of the case, therefore, now before the court, it is adjudged and decreed, that the plea be overruled, and dismissed, with costs in court occasioned by the plea, and that the schooner Active and cargo be condemned as good and lawful prize to the United States.